UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| REDHAWK MEDICAL PRODUCTS & SERVICES, LLC | * | CIVIL ACTION NO. _____ |
| VERSUS | * | JUDGE: _____ |
| ADVANCED ENERGY GROUP, LLC, AEG MEDICAL SUPPLY, LLC, and COASTAL GROUP PARTNERS, LLC | * | MAGISTRATE: _____ |

**COMPLAINT**

NOW INTO COURT, through undersigned counsel, comes plaintiff, REDHAWK MEDICAL PRODUCTS AND SERVICES, LLC, a Louisiana Limited Liability Company, authorized to do business and doing business in Louisiana, (hereinafter sometimes referred to as "REDHAWK"), who for its Original Complaint alleges as follows.

*I)* ***PARTIES***

Made defendants to this action are:

1) ADVANCED ENERGY GROUP, LLC, a foreign Limited Liability Company, domiciled in Nevada, doing business in Louisiana, and may be served through its agent for service of process, Nevada Corporate Planners, Inc., 10785 W. Twain Avenue, Suite 229, Las Vegas, Nevada, 89135.

2) AEG MEDICAL SUPPLY, LLC, a foreign Limited Liability Company, domiciled in Wyoming, doing business in Louisiana, and may be served through its agent for service of process, Registered Agents, Inc., 30 N. Gould Street, Suite R, Sheridan, Wyoming, 82801.

3) COASTAL GROUP PARTNERS, LLC, a foreign Limited Liability Company, domiciled in Wyoming, doing business in Louisiana, and may be served through its agent for service of process, Registered Agents, Inc., 30 N. Gould Street, Suite R, Sheridan, Wyoming, 82801.

**II)     JURISDICTION AND VENUE**

1)     "Diversity of Citizenship" - 28 U.S.C. 1332 (a)(1) applies to this cause of action as the subject matter of this dispute is between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs. The Western District of Louisiana has diversity jurisdiction over this matter, as follows:

    a)     REDHAWK is a Limited Liability Company organized under the laws of Louisiana with its principal place of business in Lafayette, Louisiana. As such, REDHAWK is a citizen of Louisiana.

    b)     ADVANCED ENERGY GROUP, LLC, is a Limited Liability Company organized under the laws of Nevada with its principal place of business in Las Vegas, Nevada. As such, ADVANCED ENERGY GROUP, LLC, is a citizen of Nevada.

    c)     AEG MEDICAL SUPPLY, LLC, at all relevant times, is or was a Limited Liability Company organized under the laws of Wyoming with its principal place of business in Sheridan, Wyoming. As such, AEG MEDICAL SUPPLY, LLC, is a citizen of Wyoming.

    d)     COASTAL GROUP PARTNERS, LLC, is a Limited Liability Company organized under the laws of Wyoming with its principal place of business in Sheridan, Wyoming. As such, COASTAL GROUP PARTNERS, LLC, is a citizen of Wyoming.

    e)     A Final Judgment against N95 Shield, LLC, of $45,000,000.00, plus interest, costs, and attorney's fees was rendered by this Honorable Court.

    f)     The facts contained herein will provide that defendants had custody and control over the financial obligation of N95 Shield, LLC.

2) "Supplemental Jurisdiction" – 28 U.S.C. 1367(a) applies to this cause of action as the subject matter of this claim centers upon the fraudulent actions of these defendants, causing the breach of the contract made subject of *Redhawk v. N95 Shield, LLC*, CA No. 6:23-CV-1021, United States District Court, Western District of Louisiana, which maintains original jurisdiction.

    a) In *Redhawk v. N95 Shield, LLC*, this court confirmed the arbitration award in favor of Redhawk and against N95 Shield, LLC, which found that a breach of contract occurred.

    b) Upon information and belief, the SPA was intentionally breached by the involvement of defendants and their collusion with N95 and its members, Miller, Reiss, and Holcombe, as it was defendants who were in control of and had custody of those funds presented by N95 to confect the SPA.

3) Venue and jurisdiction are also proper in this action pursuant to 28 U.S.C. § 1391(a)(2), as follows:

    a) REDHAWK and N95 agreed to this jurisdiction, venue, and choice of law, in the venue clause found in Paragraph 13 of the Sales and Purchase Agreement (sometimes referred to as the "SPA") and subject of this suit, which reads as follows: "This Agreement shall be governed by and construed in accordance with the laws of the State of Louisiana."

    b) REDHAWK and N95 also agreed to jurisdiction and venue as it relates to the arbitration award, found in Paragraph 25 of the Sales and Purchase Agreement and subject of this suit, which reads, in pertinent part, as follows: "Judgment may be entered upon the arbitrator's award by any court having jurisdiction."

    c) This contract was negotiated in Louisiana.

d) Defendants were aware of the SPA and its contents, including all choice of law, venue and jurisdictional provisions, namely Paragraphs 13 and 25.

e) Defendants were aware of the SPA and its contents, including all funding provisions, exercising control over all financial aspects of the purchase outlined in the SPA, to carry out this fraudulent scheme.

f) The SPA subject of this suit is the vehicle used by defendants to commit the fraudulent acts alleged herein.

## III) SUMMARY OF COMPLAINT

Defendants, ADVANCED ENERGY GROUP, LLC (sometimes referred to as "AEG"), AEG MEDICAL SUPPLY, LLC (sometimes referred to as "AEG Medical"), and COASTAL GROUP PARTNERS, LLC (sometimes referred to as "Coastal"), (hereinafter sometimes collectively referred to as "defendants" or "corporate defendants"), are liable to complainant, REDHAWK MEDICAL PRODUCTS AND SERVICES, LLC ( sometimes referred to as "REDHAWK"), for the full and true sum as is reasonable under the premises, plus legal interest from the date of judicial demand until paid, and all costs of these proceedings, for the following:

1) This cause of action arises out of the defendants' intentional failure to fund the transaction outlined in the SPA. Defendants orchestrated the actions of N95 Shield, LLC's (sometimes referred to as **"N95"**) and provided the appearance of available funds to obtain key information through fraudulent means.

2) Defendants caused N95 to breach the Sales and Purchase Agreement (sometimes referred to as the SPA) between REDHAWK and N95.

3) As will be set forth below, all defendants were involved in this transaction.

4) As will be set forth below, all defendants had knowledge of this transaction.

5) Upon information and belief, defendants, AEG, AEG MEDICAL, and COASTAL had total control over the funding for the SPA.

6) More specifically, upon information and belief, defendants, AEG, AEG MEDICAL, and COASTAL manipulated their bank deposits in a scheme to defraud REDHAWK. Defendants intentionally misrepresented that N95 had the funds required to complete the transaction detailed in the SPA when they knew N95 did not have such funds. These defendants falsely manipulated their banks to misrepresent that Tens of Billions of Dollars were available in N95's bank account, then denied N95's use of the funds to make the initial cash deposit required by the SPA. Defendants thereby intentionally caused N95 to breach the SPA. All of this was done solely to obtain key insider information, and then to defraud REDHAWK.

7) The use of banks in this transaction was an integral part of the fraud committed by defendants, and therefore constitutes Federal bank fraud, under 18 U.S.C. 1344, wire fraud under 18 U.S.C. 1343, and fraud against REDHAWK.

IV) **FACTUAL AND PROCEDURAL BACKGROUND**

1) In early 2021, REDHAWK and N95 were introduced. At or around this introduction, N95 consisted of Members, Matthew Scott Miller, Peter Reiss II, and Browning Holcombe III.

2) N95 represented to REDHAWK that it had been involved in several transactions of PPE products, through the connections and business partnerships of N95 SHIELD and its members, Miller, Reiss, and Holcombe, with corporate defendants, AEG, AEG MEDICAL, and/or COASTAL.

3)     Upon information and belief, N95 holds a 1/3 ownership interest in corporate defendant, COASTAL GROUP PARTNERS, LLC.

4)     N95 falsely declared its intent to conduct business with REDHAWK, who had connections to large wholesalers, such as 3M.

5)     N95 represented to REDHAWK that N95 had customers or "exit-buyers" that were seeking large quantities of PPE products, including masks. According to N95, these customers and "exit-buyers" were identified through the partnership between N95 and its members, Miller, Reiss, and Holcombe, with corporate defendants.

6)     REDHAWK, as Buyer Mandate for N95, sought large quantities of PPE products for N95 to purchase and sell to its customers or "exit-buyers".

7)     REDHAWK communicated with N95 and its member, Matthew Scott Miller, via WhatsApp, and provided updates on REDHAWK's PPE product search for N95's customers.

8)     On or about April 9, 2021, REDHAWK informed N95 that REDHAWK connected with Mahler Law Group, the representative of the Allocation Holder of the 3M 1860 respirator masks. As manufacturer, 3M would ship and sell large quantities of PPE solely through Allocation Holders previously approved by 3M.

9)     As the Buyer Mandate for the Mask Transaction, REDHAWK informed N95 of the 3M Standard Operating Procedures for this transaction, which required all parties to submit documentation solidifying the parties' identities and their abilities to complete the sale, i.e. funding the transaction.

10)    As required by the manufacturer and the Allocation Holder(s), N95 secured and provided a Letter of Attestation, dated May 7, 2021, from N95 SHIELD's counsel,

       Jennifer Asare, which represented that N95 had $660,000,000.00 (Six Hundred and Sixty Million Dollars) in available funds in its MidFirst Bank Account (XXXXXX8095).

11) On or about May 8, 2021, REDHAWK was assured by the representative of the Allocation Holders that "The title for this product is resting with 3M and we coordinate with 3M counsel to deliver SGS and the masks."

12) On or about May 13, 2021, REDHAWK, as Buyer Mandate, informed N95 that the title for this lot of (500 Million) masks to be purchased by N95 rested with manufacturer, 3M.

13) N95, through its member Matthew Scott Miller, informed REDHAWK that they have other entities who could "proof up" for N95, and that N95 would make this request from the representatives of these entities, namely, Dr. Hamid Mohammadi of AEG, and Michael Zarkovacki of COASTAL GROUP PARTNERS.

14) Upon information and belief, N95 Shield and its members, Miller, Reiss, and Holcombe, shared bank accounts, offices, addresses and employees with corporate defendants.

15) On or about May 16, 2021, N95 was informed of the Standard Operating Procedures required by 3M and the Allocation Holder for this transaction. These procedures required that shortly after the Letter of Attestation was received, proving that the buyer had the necessary funds ($950 Million) to purchase 500 million masks, $9.5 Million deposit must be made within the first day after a Sale Agreement was executed. Further, no Lot Numbers or SGS reports could be exchanged by Mahler Law Group, the representative of the Allocation Holder

    approved by 3M, until the deposit was verified.

16) N95 provided REDHAWK with the preliminary documentation required by 3M's due diligence procedures and standard operating procedures, including an irrevocable purchase order, a non-disclosure and non-circumvention agreement, and other anti-money laundering documentation required by 3M and federal laws.

17) On or about May 17, 2021, REDHAWK, through its connections, tentatively procured and reserved a lot of 500 Million 3M masks from the 3M Allocation Holders with the "exit-buyers" and funding to be provided by N95.

18) On or about May 17, 2021, REDHAWK introduced N95 and its member, Matthew Scott Miller, to the Mahler Law Group, the legal representative of the 3M Mask Allocation Holders. 3M required that the funds necessary to complete the transaction requested must be certified by the prospective purchaser. Therefore, before executing the SPA, N95 as the prospective buyer chosen by defendants was required to verify funds.

19) On or about June 3, 2021, REDHAWK received a Letter of Attestation, dated June 3, 2021, from N95 which provided the following certifications by N95's counsel, Jennifer Asare:

    a) I represent N95 Shield, LLC, and or assigns with regards to the purchase of authentic PPE products. This letter serves to attest that my client is ready, willing, and able to proceed to closing on the purchase of five hundred million (500,000,000) authentic 1860 respirator masks. In addition, this letter shall certify that my client has sufficient funds available for the purchase and funding of the aforementioned PPE product. My client has provided proof of funds in excess of TWENTY-FOUR BILLION FOUR HUNDRED MILLION UNITED STATES DOLLARS ($24,400,000,000.00) for the purchase of the authentic PPE Product for the sale, supply & distribution to Government, FEMA, Federal, State, and Private Healthcare, 1st responders, Medical Workers, Federal Employees, and or other Non-Retail users and its affiliates. Funds are available and will

       be transferred into the Seller's Escrow upon receipt and review of the SGS sport, BOL, Lot inspection or other proof of life. As to source of funds provided by wire transfers, I will follow all disclosure requirements of my licensed bank as to any reporting, Fin CEN requirements, or other disclosure requirements. This letter of attestation is for the use of this transaction only and may not be used for any other purposes of Proof of Funds. Verification of funds required should be directed to jasare@asarelaw.com for scheduling of an attorney-to-attorney call.

20) One or more of the corporate defendants fraudulently manipulated banks [i.e., MidFirst Bank Account Number XXXXXX8095] to misrepresent that there were available funds of $660,000,000.00 on May 7, 2021, and $24,400,000,000.00 on June 3, 2021, for use by N95 to finance this transaction.

21) On June 3, 2021, N95, through its member, Matthew Scott Miller, made representations to REDHAWK that N95 had received confirmation that the "exit-buyers" were ready to purchase this lot of 500 Million masks.

22) On or about June 8, 2021, through its member Matthew Scott Miller, N95 informed REDHAWK that it had acquired 3 Purchase Orders for 500 Million 3M masks.

23) On June 9, 2021, N95 informed REDHAWK that N95 had secured funding of the $9.5 Million Deposit for the purchase of 500 million masks.

24) On or about June 10, 2021, to procure and reserve this lot of 500 Million 3M masks, REDHAWK executed an agreement with Mahler Law Group, as representative of the 3M Allocation Holders.

25) On June 22, 2021, N95 entered into the SPA with REDHAWK detailing N95's purchase of 500 million 3M 1860 Masks at a total purchase price of $950 million, perpetuating defendants' fraud to obtain a direct connection to the largest PPE Manufacturer, 3M.

26) The Agreement contained a provision which required, in pertinent part, "within one (1) business day following execution and exchange of this Agreement, Purchaser shall transfer (or have a third-party on its behalf) deposit $9,500,000.00 into the Moseley and Lester Escrow Account (the "Moseley & Lester Escrow Account").

27) The contract was breached at the expiration of that "first business day" when N95, or its assigns, namely, defendants, who controlled the financing for the deal, failed to transfer $9.5 million into the escrow account, as required by the SPA.

28) REDHAWK sustained damages due to the breach of the SPA caused by defendants.

29) Upon information and belief, corporate defendants knew that the representations made to REDHAWK in the Letters of Attestation dated May 7, 2021, and June 3, 2021, were false.

30) Upon information and belief, corporate defendants knew that the represented funds were not controlled by N95, and that such funds would never be made available to N95 to fund this transaction.

31) Upon information and belief, at the time of the execution of the SPA, these defendants knew that they would never fund the SPA with REDHAWK or perform on N95's behalf.

32) Upon information and belief, defendants utilized information gained through N95 members, Miller, Reiss, and Holcombe, to entice REDHAWK to provide critical information, which was subject to a non-disclosure and non-circumvention agreement, so that the defendants could circumvent the SPA.

33) Upon information and belief, the Corporate Defendants used N95 and its members, Miller, Reiss, and Holcombe, to intentionally cut REDHAWK out of the contracted transaction and divert REDHAWK's portion of the commissions for their benefit.

34) From the beginning, the corporate defendants fraudulently used N95 members, Miller, Reiss, and Holcombe, and N95 as a fictitious shell to acquire connections and critical information from REDHAWK of those Allocation Holders authorized by 3M to receive wholesale orders of PPE, and then to circumvent Buyer Mandate, REDHAWK, and its share of the sales commissions.

35) On December 21, 2021, REDHAWK sent correspondence to N95 and its members, Miller, Reiss, and Holcombe, notifying them of the default on the SPA, including a spoliation notice for all documentation related to this transaction.

36) On January 6, 2022, REDHAWK sent notice of default with a request for N95 and its members, Miller, Reiss, and Holcombe to cure the default within ten (10) days. Neither N95, nor defendants herein, cured the default on financing.

37) On January 20, 2022, REDHAWK sent correspondence to N95 and its members, Miller, Reiss, and Holcombe, informing them that the deadline for N95 to cure its default had expired.

38) On May 22, 2022, a demand for arbitration was filed with JAMS, per the terms of the SPA.

39) On June 8, 2022, a copy of this demand for arbitration was served and delivered on N95 and its members, Miller, Reiss, and Holcombe.

40) Further, upon information and belief, N95, through agreement of its members, Miller, Reiss, and Holcombe, and with knowledge and direction of defendants, filed for termination on or about June 10, 2022. The Articles of Termination were executed by N95 member, Matt Miller, as CEO.

41) Despite the required legally sufficient notice, Neither N95 nor its members, Miller, Reiss, and Holcombe, made an appearance or participated in the arbitration of this matter.

42) Under Paragraph 25 of the agreement between the parties, Arbitration may proceed without the participation of both parties. In pertinent part, the Agreement states: "Should either Party refuse or neglect to appear or participate in the arbitration proceeding, the arbitrator is empowered to decide the claim or controversy in accordance with the evidence presented."

43) This matter was arbitrated on February 22, 2023, by Michael Messangale of JAMS, per the provisions of the SPA.

44) The final arbitration award was issued on May 1, 2023.

45) After consideration of all testimony, exhibits, evidence and the laws of Louisiana, it was determined that N95 breached the contract causing contractual damage to REDHAWK in the amount of $44,950,000.00. As the prevailing party in this proceeding, REDHAWK was awarded attorney's fees in the amount of $32,571.55 and costs in the amount of $36,042.76.

46) With regard to interest, it was determined that REDHAWK is entitled to pre-award interest on its contract damages, at the applicable judicial interest rate prescribed by Louisiana law, totaling $3,365092.47.

47) Additionally, REDHAWK is entitled post-award interest on its contractual damages as well as attorney's fees and costs, through date of payment or confirmation of the Arbitration award.

48) This arbitration award was confirmed by This Honorable Court, under Action No. 6:23-cv-01021-DCJ-CBW, on May 28, 2024. Judgment was entered in favor of Plaintiff Redhawk Medical Products & Services LLC against N95 Shield, LLC, in the amount of $44,950,000.00 in damages; attorneys' fees in the amount of $32,571.55; costs in the amount of $36,042.76; pre-award interest in the amount of $3,365,092.47; and post-award interest on the sum awarded for contract damages, attorneys' fees, and costs in an amount to be determined at the time of payment.

49) REDHAWK's collection efforts have confirmed the connection of the corporate defendants with the SPA and uncovered this financial scheme described herein.

50) Upon information and belief, the bank accounts referenced in N95's Letters of Attestation were owned by corporate defendants, who had complete control over the use of its funds.

51) As such, REDHAWK's damages are due to defendants' fraudulent scheme using N95 and currently total approximately $51 million. Post-award interest continues to accrue until date of payment.

## V) CAUSE OF ACTION

Corporate defendants, AEG, AEG MEDICAL, and/or COASTAL, caused REDHAWK to sustain damages, through its fraudulent actions, activities and representations, set forth herein and below:

1) Upon information and belief, the corporate defendants fraudulently caused N95's failure to perform its obligations under the SPA between the parties;

2) Upon information and belief, corporate defendants are partners in business with N95 and share connections with N95;

3) Upon information and belief, at the time of the transaction outlined in the SPA, N95 was one (1) of three (3) juridical entities with ownership interest in COASTAL;

4) Upon information and belief, corporate defendants and N95 shared bank accounts, offices, addresses, and employees;

5) Upon information and belief, corporate defendants provided the "end-buyers", including hospitals and other medical associations in need of these 3M PPE products;

6) Upon information and belief, corporate defendants knew the details of the SPA between the parties for the Mask Transaction, including the $9.5 Million deposit due within 1 day of execution, and in fact, directed N95's execution of the SPA with REDHAWK;

7) Upon information and belief, corporate defendants fictitiously used N95 as the apparent purchaser of the PPE products from 3M through REDHAWK and were involved with the fraudulent appearance of the financial ability of N95 required by 3M to complete the transaction obligations of N95 required under the SPA;

8) Upon information and belief, N95 was given access to the bank accounts of corporate defendants; or alternatively, N95 was given funds by corporate defendants to support the Letters of Attestation dated May 7, 2021, and June 3, 2021;

9) Upon information and belief, corporate defendants fabricated the existence of funds as belonging to N95 accounts, as referenced in the May 7, 2021, and June 3, 2021, Letters of Attestation provided by N95;

10) Upon information and belief, defendants, AEG, AEG MEDICAL, and/or COASTAL prohibited N95's use of those funds referenced in the Letters of Attestation dated May 7, 2021, and June 3, 2021;

11) Upon information and belief, defendants AEG, AEG MEDICAL, and/or COASTAL, directed N95 to default, or alternatively, caused the default of N95 by prohibiting its use of the corporate defendants' funds; and

12) Upon information and belief, defendants AEG, AEG MEDICAL, and/or COASTAL, directly or through N95, intentionally obtained protected information by fraudulent means to cut REDHAWK out of the transaction, and to divert REDHAWK's $44,950,000.00 to themselves.

## VI) DAMAGES

1) As will be proven at the trial of this matter, defendant, ADVANCED ENERGY GROUP, LLC, directly and/or vicariously by and through its agents, representatives, and/or its employees, is liable to complainant, REDHAWK MEDICAL PRODUCTS AND SERVICES, LLC, for the damages memorialized in the Judgment of this Honorable Court dated May 28, 2024.

2) As will be proven at the trial of this matter, defendant, AEG MEDICAL SUPPLY, LLC, directly and/or vicariously by and through its agents, representatives, and/or its employees, is liable to complainant, REDHAWK MEDICAL PRODUCTS AND SERVICES, LLC, for the damages memorialized in the Judgment of this

Honorable Court dated May 28, 2024.

3) As will be proven at the trial of this matter, defendant, COASTAL GROUP PARTNERS, LLC, directly and/or vicariously by and through its agents, representatives, and/or its employees, is liable to complainant, REDHAWK MEDICAL PRODUCTS AND SERVICES, LLC, for the damages memorialized in the Judgment of this Honorable Court dated May 28, 2024.

4) In addition, all defendants, ADVANCED ENERGY GROUP, LLC, AEG MEDICAL SUPPLY, LLC, and COASTAL GROUP PARTNERS, LLC, should be cast with all costs of REDHAWK MEDICAL PRODUCTS AND SERVICES, LLC's, attorney's fees, expert fees, litigation expenses, and court costs.

WHEREFORE, complainant, REDHAWK MEDICAL PRODUCTS AND SERVICES, LLC, prays for judgment in its favor over and against defendants, ADVANCED ENERGY GROUP, LLC, AEG MEDICAL SUPPLY, LLC, and COASTAL GROUP PARTNERS, LLC, for monetary damages, in the full and true sum as is reasonable under the premises, and which will be proven at the trial of this matter, plus the cost of these proceedings together with legal interest from the date of judicial demand and all other equitable relief as the law or case may allow.

Respectfully submitted:

BY: /s/ André F. Toce
ANDRÉ F. TOCE (#16769)
The Toce Firm, APLC
969 Coolidge Boulevard
Lafayette, LA 70503
Phone: (337) 233-6818
Fax: (866) 306-9336
andre@toce.com
Attorney for Complainant

BY: /s/ *Jason M. Welborn*
    JASON M. WELBORN (#26548)
    JACOB H. HARGETT (#32490)
    G. SHELLY MATURIN (#26994)
    HOLLY C. BOUSTANY (#37599)
    Welborn & Hargett, LLC
    1031 Camellia Blvd
    Lafayette, LA 70508
    Phone: (337) 234-5533
    Fax: (337) 769-3173
    jason@wandhlawfirm.com
    jacob@wandhlawfirm.com
    shelly@wandhlawfirm.com
    holly@wandhlawfirm.com
    Attorneys for Complainant